UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:15-CR-10-GFVT-HAI-1 |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| JERRY LUKE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*** *** *** ***

With a warrant in hand and consent, law enforcement searched Defendant's residence and seized, among other items, some computer equipment.  Then law enforcement relied upon observations made during the search to obtain a second warrant authorizing a search of the computer equipment for evidence of child pornography.  They found such evidence.

But neither the first warrant, consent, nor the plain view doctrine validly authorized the seizure of the computer equipment.  The observations made during the search were appropriate, however, because of Defendant's consent to the search.  To further complicate the matter, the second warrant did not establish probable cause to search the computer equipment.  Because the parties have not fully analyzed *Leon* or the flagrancy-deterrence calculus in these unique circumstances, further briefing is required.  To inform that briefing, the Court sets forth its reasoning as to the validity (or invalidity) of the seizure and searches below.  After allowing sufficient time to review, the Court will hold a status conference to discuss a schedule for further briefing.

## I.  FACTUAL BACKGROUND

The closest questions before the Court concern the validity of the two search warrants relied upon by the United States to validate the searches and seizures at issue.  In answering these questions, the Court is limited to reviewing the four corners of the supporting affidavits. *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005).  To memorialize all the circumstances, however, the Court recites the chronology of events established at the evidentiary hearing, which are uncontested.

On January 15, 2013, Knox County Sheriff's Deputy Claude Hudson Jr. received a call about a missing juvenile female.  D.E. 62 at 12-13.  Hudson learned from the juvenile's mother that the juvenile had run away from home the previous night following a verbal argument regarding the juvenile's relationship with Defendant.  *Id.* at 12-15.  The mother indicated to Hudson that she believed the juvenile was with Defendant due to the argument.  *Id.* at 13. Moreover, Hudson was informed that the juvenile's father had been to Defendant's residence, but had been unable to make contact with him there.  *Id.* at 15-16.  The parents were, however, able to reach Defendant by phone, and he indicated that he was not with the juvenile.  *Id.* at 16-17.  Hudson testified that he also attempted to call Defendant's cell phone but it appeared to be turned off.  *Id.* at 16.

Hudson went to Knox Central High School to further investigate.  *Id.* at 18.  Upon talking to the juvenile's friends, Hudson learned that the juvenile "had bragged about dating an older 40 year-old-man," but the friends did not know the man's name.  *Id.* at 18-19.  Hudson then interviewed one of the juvenile's friends who had stayed home sick from school that day.  *Id.* at 19.  The friend was able to provide him with Defendant's cell phone number because the missing juvenile had used the friend's phone to speak to Defendant on a prior occasion.  *Id.* at 19-21.

2

Furthermore, the friend confirmed to Hudson that the juvenile was dating an older male.  *Id.* at 21.

Hudson went by Defendant's residence and found that Defendant was not home, but he spoke to Defendant's neighbors.  *Id.* at 22.  The neighbors informed Hudson that, if Defendant returned to the residence, they would call contact the police.  *Id.*  After leaving Defendant's residence, Hudson "pinged [Defendant's] cell phone" through AT&T.  *Id.*  This allowed him to obtain the GPS coordinates of Defendant's phone.  *Id.* at 22-24.  However, this procedure revealed that, at the time, Defendant's phone was shut off and, therefore, Hudson was unable to gather any GPS information.  *Id.* at 23-24.  After this, an "attempt to locate" was called out on Defendant and officers were driving by Defendant's residence, but the case had gone "cold."  *Id.* at 24-25.  Hudson testified that, from the time he got the ping information until his shift began at 6 a.m. the following day, he did not receive any GPS location information for Defendant's phone.  *Id.* at 25.

At the beginning of his shift on January 16, 2013, Hudson contacted the juvenile's mother to see if she had returned home.  *Id.* at 25-26.  According to Hudson, the mother informed him that she had not heard from the juvenile, but had learned Defendant had a commercial driver's license and she was fearful that Defendant and the juvenile might leave the state.  *Id.* at 26.

Hudson testified that his next step in the investigation was to obtain a search warrant (the January 16, 2013 warrant) for Defendant's residence, and did so "about 8" that morning from Judge Durenda Lundy, a Knox County family court judge.[1]  *Id.* at 27, 110.  Hudson's affidavit for the first warrant requests that he be able to search for a variety of personal property, including

---

[1] The affidavit indicates it was sworn to at 11:44 a.m.  *See* Government's Exhibit 1.  However, Hudson testified that this was a simple mistake.  D.E. 62 at 110.

3

evidence of controlled substance offenses, United States currency, weapons used to facilitate drug transactions, stolen property, and finally, "any pictures, zip drives, external hard drives, computers, cell phones, C.D.'s or any property indicating child pornography or unlawful transactions with minors."   Government's Exhibit 1 at 1.   Hudson acknowledged that the affidavit was not completely "accurate," explaining that, when he applies for a warrant, he uses "a template" and that he had a "bad habit" of using form language that is "a little broad."  *Id.* at 29-30, 114.

Hudson admitted that he had no reason to believe that Defendant was engaged in drug trafficking, possessed any weapons used to facilitate drug transactions, or possessed any stolen property.  *Id*. at 114.  However, he testified that, at the time he obtained the warrant, he was "leaning" towards believing that Defendant was engaged in child pornography because Defendant "is a 44 year-old man with a 16 year-old child that looks like a ten-year old."  *Id.* at 114-115.  That observation, as to her appearance, was made based upon a picture of the juvenile that he had seen.  *Id*.  Thus, he testified that actually he was seeking evidence related to child pornography and unlawful transactions with minors.  *Id*. at 32.  However, Hudson admitted that, at the time of the application for the warrant, he had no knowledge of any computers, hard drives, cameras, or zip drives that Defendant may have possessed or owned.  *Id*. at 116-17.  He further admitted that, at the time of the application, he had no reason to tie the juvenile to Defendant's residence except the fact that it was the Defendant's home and she might be with him.  *Id.* at 122-23.

Hudson stated that law enforcement knew Defendant had "already been contacted by the parents and been advised by the parents that they did not want their daughter with him….[s]o if we caught the daughter with him, then we knew he was in -- in the -- he was guilty of custodial

4

interference with the parents." *Id.* at 30-31.  He further testified that he was concerned with "improper text messages" between Defendant and the juvenile, and believed that he could find evidence of that in "anything from a note pad to the computer, to even cameras, pictures he may have took, and the destination they may have been to[.]" *Id.* at 31.  He stated that he believed he would find records of communications between the two "mostly on the computer." *Id.* at 32.

Hudson testified that, almost immediately after obtaining the warrant, he received ping information that indicated Defendant's cell phone had been turned on and provided GPS coordinates of the phone. *Id.* at 35-36.  He and another Sheriff's Deputy, Keith Liford, began to drive towards to the phone's location in Whitley County. *Id.* at 36.  About the same time, Hudson was contacted by the juvenile's mother who stated that the juvenile had contacted the juvenile's sister and indicated that the juvenile had stated she was okay and not to "worry about me." *Id.* at 37.  Officer Hudson stated that the juvenile had made contact with her sister using Defendant's cell phone, but he could not recall if that contact was made via text message, Facebook, or otherwise. *Id.* at 38.

Hudson then contacted the Corbin Police Department to assist in the search for Defendant's vehicle. *Id.* at 39.  Law enforcement located the truck in the parking lot of the Corbin Post Office, where it was parked near the back of the lot. *Id.* at 40.  Defendant and the juvenile were found in the truck, and when Hudson arrived on the scene, Defendant was already in handcuffs in the back of a patrol car. *Id.* at 41-42.  Hudson read Defendant his *Miranda* rights and Defendant signed a *Miranda* waiver at 10:36 a.m. *Id.* at 43-46; *see* Government's Exhibit 5. Hudson testified that the only statement Defendant made was that "the juvenile was better off with him than he [sic] was the parents." *Id.* at 46.

Law enforcement searched the vehicle at the scene and found four cell phones, a blanket, and two pornographic magazines. *Id.* at 46-48. The blanket was in the backseat, and Hudson speculated that the Defendant and juvenile used it to stay warm because she had indicated they spent the night in the truck. *Id.* at 48-49. He further stated that the magazines were found directly behind the driver's seat, and that they appeared to be "legal magazines." *Id.* at 48, 134. Hudson also noted that the girls depicted on the magazine covers did not "look like nine- or ten-year-olds." *Id.* at 171. Notably, these magazines were not seized, but their covers were photographed. Government's Exhibit 3.

Defendant was arrested and charged with custodial interference in violation of KRS § 509.070 and third-degree unlawful transaction with a minor in violation of 530.070. *Id.* at 51-52. After securing Defendant, Hudson took the juvenile to be reunited with her parents at a local business. *Id.* at 53-54. Hudson stated that he and Liford conducted an interview of the juvenile while they waited for her parents to arrive. *Id.* at 54. Hudson testified that the juvenile told them that she and Defendant had been to his home, had sexual intercourse, and had slept in the truck the night before. *Id.* The juvenile was upset after this experience. *Id.* at 55.

After returning the juvenile to her parents, Hudson and Liford proceeded to the Corbin Police Department where Defendant was being housed in order to transport him to the Knox County Jail. *Id.* at 56. During the transport, Defendant "asked if we could stop by his house so he could tend to his dogs and feed them and water them." *Id.* at 58. Hudson stated that Defendant brought this up on his own, and was not asked a question to elicit this statement. *Id.* Hudson testified that Liford is "a animal [sic] lover his self, so he – we agreed to let him go take care of his dogs. We were driving right by the house anyway[.]" *Id.* at 59.

Upon arriving at the residence, Defendant indicated that he did not have his key, so the officers allowed him to climb through a window to unlock the door. *Id.* at 60-62. According to Hudson, he and Liford allowed Defendant to do this because he was "good" to them and they advised Defendant to not run because "that's another felony." *Id.* at 61. Hudson stated that, after Defendant went through the window, he opened the front door for the officers within two to three seconds, and they followed him into the house. *Id.* at 62-63.

Hudson testified that Defendant's residence is "a very small house. You basically have a living room, foyer room, kitchen and bedroom. That's basically it in a nutshell." *Id.* at 63. Law enforcement had "a look around" to make sure no one else was there, to find any weapons, or to rule out anything else that may pose a risk to the officers. *Id.* at 64-65. Hudson stated that, while Defendant was tending to his dogs in the kitchen, he saw some "unusual" items in the home, specifically "a multitude of external hard—computer towers, external hard drives, a multitude of zip drives right there, right behind the door. The door actually—the front door actually opens into it right there." *Id.* Hudson stated that he could see these computer-related items from the window, but got a clearer view once inside the residence. *Id.* Hudson also testified that, in the kitchen, there was "another little cage" made of "chicken wire" and was "big enough for a human." *Id.* at 69. Hudson testified that he "could tell no animals had been inside of it" because it did not contain feces or anything of that nature. *Id.* However, Hudson stated that the cage contained a "human wig mask-type thing" that was made to look like a human. *Id.* at 69-70.

After seeing these items, Hudson said to Defendant "'you have some interesting items. Do you care if we look around?' He responded, 'No, go ahead.'" *Id.* at 71. Hudson stated that, inside the bedroom, they found "[a] briefcase with, like, leg shackles, a whip, a choking collar" in the "[b]edroom closet area." *Id.* at 68. Moreover, Hudson testified they found some

pornographic magazines that "just wasn't pornographic.  They was—the women in them was—looked more like children.  They did not look like women."  *Id*.  He later stated "the magazines…portrayed…ten-year-old kids."  *Id*. at 86.  However, Hudson later testified that, of all the magazines he found, including the two in the truck, only one appeared to depict an image of a very young girl.  *Id*. at 155.  Moreover, Hudson admitted that there was nothing in the residence that showed child pornography at the time, that the magazines were legal, and that the computer equipment was not immediately incriminating.  *Id.* at 126, 133-34, 138.

Once Defendant had tended to his dogs, Hudson and Liford escorted Defendant back to the police cruiser.  *Id*. at 74.  Defendant signed a consent to search form that Hudson viewed as just confirming the consent that Defendant previously gave.  *Id*. at 74-79; *see also* Government's Exhibit 10.  This consent authorized law enforcement to "complete a full search of the premises, property or vehicle" located on the property.  Government's Exhibit 10.  Moreover, the consent form stated that Defendant knew he had "a right to refuse to consent, and I voluntarily give up that right" and that "the officer does not have a search warrant."  *Id*.  Finally, the consent form stated that Defendant had not been threatened or coerced, and that he read and understood the form.  *Id*.  Hudson acknowledged that the consent form did not authorize the seizure of any property.  D.E. 62 at 153.

Hudson allowed Defendant to read the consent form himself, and at no point did Defendant indicate he did not understand the form.  *Id*. at 77.  Moreover, Defendant did not indicate any confusion about the form at any point, and never objected to signing it.  *Id*.  Hudson testified that, consistent with the language in the form, he did not tell Defendant that he had a warrant for the residence before Defendant signed the consent form.  *Id.* at 78.  Hudson testified

that, after Defendant signed the consent form, he told him that they "did have a search warrant for the residence, and then I went over the search warrant with him." *Id*. at 79.

At this point, Hudson went back inside the residence to photograph what he had seen previously. *Id*. at 80. While Hudson was doing this, Defendant was in the back of the police cruiser. *Id*. Hudson testified that he seized a large amount of electronic equipment, but left the pornographic magazines in the residence. *Id*. at 82. According to Hudson's inventory, he seized two computer towers including their hard drives, fifteen zip drives, two memory cards, two external hard drives, five cell phones, two film cameras, a handheld radio, and a VHS video recvorder with film. Government's Exhibit 1; *see also* Government's Exhibit 13 (photograph of seized items). He testified that he took this evidence because "I only take anything I'm going to test." D.E. 62 at 82.

Hudson testified that, after seizing this evidence, Defendant was taken to the Knox County Jail at which point the officers attempted to talk to him again. *Id*. at 82-83. Defendant was re-read his *Miranda* rights, and indicated that he would like to have an attorney present. *Id*. at 83. Hudson stated that, after this request, he did not ask Defendant any further questions. *Id.* According to Hudson, the next step in his investigation was to obtain a warrant in order to view the contents of the electronic equipment seized from Defendant's home. *Id*. at 84.

The affidavit for the January 17, 2013 warrant states that "there is reasonable and probable grounds to believe there is illegal pornography pictures of under age children but not limited to other illegal conversation or activity within the memory of the seized items[.]" Government's Exhibit 14 at 1. Hudson stated he believed they would find child pornography on the seized items because Defendant is "attracted to younger…girls" based upon the facts that Defendant "run off with a 16 year-old juvenile that looked like a nine-year old, and then the

magazines themselves portrayed looked ten-year old kids." D.E. 62 at 86. Hudson testified he believed that the items would also contain evidence of custodial interference and unlawful transaction with a minor because he knew that conversations between Defendant and the juvenile had occurred electronically in the past. *Id*. at 87.

This second warrant authorizes the search of any "[a]ny memory within the computer towers, internal hard drives, zip drives and memory cards, cell phones containing but not limited to child pornography." Government's Exhibit 15. Hudson stated that he was informed by the Kentucky State Police electronics laboratory that they needed to have a warrant to examine the seized items. D.E. 62 at 92.

Knox County Sheriff's Deputy Keith Liford testified that he has been involved in law enforcement for about seven years. *Id*. at 175. He became involved in the investigation on January 16, 2013, when he was asked to help Hudson follow a ping from Defendant's cell phone. *Id*. He testified that he did not have anything to do with the application for either the first or second warrant. *Id*. at 194. Liford stated that, when they began transporting Defendant to the Knox County Jail, Defendant asked to stop by his residence to tend to his animals. *Id*. at 183. He testified that the computer equipment was "in plain view" upon entering the residence. *Id*. at 186. He testified that Hudson asked Defendant if they could have a look around and Defendant said "absolutely." *Id*. at 186-87.

Liford described the cage as not "a small cage, but it wasn't a huge cage either; a small individual could be in that cage." *Id*. at 187. Moreover, he stated that the cage was "kind of odd," that there was "a mask of some sort" inside the cage, but that there was not anything illegal about it. *Id*. at 187, 200. He testified that inside the bedroom there were some pornographic magazines that were visible inside an open suitcase, and that the officers did not have to

10

manipulate the suitcase to view them. *Id.* at 187-88. Moreover, he testified that there was a whip and handcuffs that were laying out in the bedroom. *Id.* at 188-89.

Liford testified that he witnessed Defendant signed the consent to search form, and that Defendant did not indicate he had any trouble understanding the form. *Id.* at 189-90. Moreover, Liford confirmed that Hudson did not tell Defendant about the search warrant until after Defendant signed the consent to search form. *Id.* at 190. Liford stated that he assisted Hudson in "collecting evidence" from the residence. *Id.* at 192. Finally, he testified that he ended up transporting the seized evidence to the Kentucky State Police electronics lab for examination. *Id.* at 193.

## II. DISCUSSION

Defendant asserts multiple grounds for suppression. First, he argues that both warrants lacked probable cause, and that no reasonable officer could have relied upon them. Second, he argues that, while the search of his residence was performed pursuant to valid consent, the seizure of the computer equipment was not a valid application of the plain view doctrine. Accordingly, Defendant seeks to suppress "all evidence found from the illegal seizure of certain computer equipment and related items following a search of his residence and the subsequent examination of these items." *Id.* at 42.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause. . ." U.S. Const. amend IV. Probable cause consists of "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In order to establish probable cause to search, a warrant request must 'state a nexus between the place to be searched and the evidence sought.'" *United States v. Bethal*, 245 F. App'x 460, 464 (6th Cir. 2007) (quoting *United States v. Van Shutters*, 163 F.3d

331, 336-37 (6th Cir. 1998)).  The issuing judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Smith*, 510 F.3d 641, 652 (6th Cir. 2007) (describing this as a "totality of the circumstances" approach).

When a Defendant challenges the validity of a search warrant, the Court must "look only to the four corners of the affidavit" to determine whether the search was supported by probable cause. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citing *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003)).  A reviewing court must pay "great deference" to the issuing judge's determination.  *United States v. May*, 399 F.3d 817, 822 (6th Cir. 2005) (citation omitted); *see also United States v. Terry*, 522 F.3d 645, 648 (6th Cir. 2008) ("this circuit has long held that an issuing magistrate's decision should only be reversed if it was arbitrarily exercised.") (citation omitted).  Such deference "is not boundless." *United States v. Czuprynski*, 8 F.3d 1113, 1116 (6th Cir. 1993).  Indeed, the Supreme Court has emphasized that courts must continue to "conscientiously review the sufficiency of affidavits on which warrants are issued." *Gates*, 462 U.S. at 239.   This Court will set aside the issuing judge's probable cause determination only if the judge did not "'ha[ve] a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited.'" *Id*. (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991)).

However, line-by-line scrutiny of search warrant affidavits would be inappropriate.  *See United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 306).  Rather, "[t]he affidavit should be reviewed in a commonsense . . . manner, and the court should consider whether the totality of the circumstances supports a finding of probable cause . . . ." *United States v. Woosley*, 361 F.3d

924, 926 (6th Cir. 2004) (citing *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001)). Additionally, when analyzing the validity of the search and seizure pursuant to the warrant, the defendant "has the burden of making a prima facie case that the search was illegal." *United States v. Franklin*, 284 F. App'x 266, 275 (6th Cir. 2008). "Once he has presented a prima facie case of illegal search, the government must assume the burden of proof that any search made was lawful." *United States v. Thompson*, 409 F.2d 113, 117 (6th Cir. 1969) (citing *United States v. Burhannon*, 388 F.2d 961 (7th Cir. 1968)).

### A. The January 16, 2013 Search Warrant for Defendant's Residence

Defendant first argues that the January 16, 2013 warrant for his residence was illegal. He claims that this warrant is invalid, and to "uphold it offends the noble notions of liberty and freedom of overreaching which are the valued principles of the Fourth Amendment to the Bill of Rights." D.E. 70 at 30. First, Defendant argues that the Court, pursuant to *Franks v. Delaware*, 438 U.S. 154, 171 (1978), despite not following the correct procedure, should consider evidence outside of the affidavit that was presented during the hearing. *Id*. at 27. Second, even without the *Franks* evidence, Defendant asserts that "both the affidavit and the warrant substantively are inaccurate, misleading and (the affidavit) lacking in probable cause." *Id.*

### 1. Franks Analysis

The Supreme Court has stated that "[t]here is, of course, a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). "A defendant is entitled to a hearing to challenge the validity of a search warrant if he 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [] the allegedly false statement is necessary to the finding of probable cause." *United States v.*

*Graham*, 275 F.3d 490, 505 (6th Cir. 2001) (quoting *Franks*, 438 U.S. at 155-56). Determining whether statements are made with reckless disregard of the truth is a fact question. *See United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011) (quoting *United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007)). "If, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-172. If, however, such probable "cause does not exist absent the challenged statements, he is entitled to a hearing" and "must show at the hearing, by a preponderance of the evidence, that false statements were made either intentionally or with reckless disregard for the truth and that without these statements there is insufficient content in the affidavit to support a finding of probable cause." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1980). "If he makes this showing, the evidence should be suppressed." *Id.*

Defendant admits that "he did not initially present a *Franks* claim when he filed the motion to suppress" because defense counsel "did not fully understand Deputy Hudson's misstatements (and material omissions) in the affidavit for the 1st search warrant until he testified at the suppression hearing." D.E. 70 at 27. Defendant argues that, despite his failure to comply with the procedural requirements of *Franks*, the Court should find that he has made the required *Franks* showing and suppress any evidence from the warrant. *Id.* at 29. Defendant asserts that Hudson admitted to intentionally placing inaccurate information in the affidavit through a "deliberate and long standing practice of obtaining inaccurate and overly broad search warrants." *Id.* at 27-28.

The affidavit for the January 16, 2013 warrant contains the following paragraph describing the criminal property to be searched for and seized:

14

> **Any controlled substance and evidence of Trafficking in a controlled substance in Violation of K.R.S. 218A.  Also drug paraphernalia including objects use [sic] in packaging, distributing and measuring contraband drugs including all controlled substances, items of identification to show constructive possession of the of above contraband, such as but not limited to notes, receipts, ledgers, bill, tax returns, computers, personal letter, other personal identifications, proceeds of drug trafficking, including but not limited to United States Currency, Safes, Lock Boxes, or Safety Deposit Box Keys, or Records thereof.  Any weapons used to facilitate drug transaction, or weapons used to protect stored drugs.  Also, any stolen property that may be located inside of [sic] on the said property.**  Any pictures, zip drives, external hard drives, computers, cell phones, C.D.'s or any property indicting child pornography or unlawful transactions with minors.

Government's Exhibit 1 at 1 (emphasis added).  It is uncontested that only the last sentence had any reasonable basis in fact, thus this description was vastly overbroad.  Hudson testified that the affidavit was not completely "accurate" and that he uses the language above in bold in every affidavit he submits.  D.E. 62 at 29-30, 114.  Moreover, he stated that he knew it was a "bad habit" to do so, and that it results in warrants that are a "little broad."  *Id.* at 29-30.  He admitted that the actual property he looks for is "at the very end's [sic]" of the paragraph.  *Id*. at 30.

Therefore, Defendant is correct that, at the very least, one part of the affidavit contained some "falsity."  However, even ignoring Defendant's failure to follow the procedural dictates of *Franks*, this falsity does not entitle him to relief.  If removed from the affidavit, the false statements would not have any effect on the factual basis for any probable cause analysis.  This paragraph contains no factual content, instead it merely lists the property for which the search is to be authorized.  In truth, this is an overbreadth issue, which is addressed below.

Defendant also argues that there were material omissions by Hudson that are subject to a *Franks* analysis.  D.E. 70 at 29.  He claims that Hudson should have included "the real (and impermissible) reasons he sought the search warrant (due to [Defendant] allegedly having a CDL license and the juvenile's parents' fear he would leave the state with the girl)."  *Id.*  He further states that Hudson admitted during the hearing that the reason he was seeking the warrant was to

find out where the juvenile was.  *Id.*  Presumably, Defendant is arguing that this information should have been included in the affidavit.

In the case of an omission, a defendant must (1) make a "substantial preliminary showing" that "the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit" and (2) show that probable cause would no longer exist if such omitted information were considered by the issuing judge.  *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997) (quoting *United States v. Bonds*, 12 F.3d 540, 568 n.26 (6th Cir. 1993)).  *Franks* only "protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate[.]" *United States v. Colkley*, 899 F. 2d 297, 301 (4th Cir. 1990) (citing *United States v. Reivich*, 793 F.2d 957 (8th Cir. 1986).  Therefore, "a *Franks* hearing is only merited in cases of omissions in 'rare instances.'"  *United States v. Graham*, 275 F.3d 490, 506 (6th Cir. 2001) (quoting *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998)).

Defendant asks the Court to find that the omission of an officer's true motive is enough to suppress all evidence seized under that warrant.  In this unique situation, Defendant has provided no case law to support his position, and the Court declines to formulate his argument on his behalf.  However, the Court notes that there is no evidence that Hudson's omissions here were "designed to mislead" or were "made in reckless disregard of whether they would mislead the magistrate" as required by the case law.  *See Colkley*, 899 F.2d at 301.  Thus, given that a Defendant is entitled to a *Franks* hearing based upon an omission in "rare instances," Defendant's argument here is unavailing.

Therefore, ignoring Defendant's failure to comply with the procedural requirements of *Franks*, for the reasons described above, Defendant has not established he is entitled to any sort

16

of relief pursuant to *Franks*.  Accordingly, the Court will analyze the validity of the warrant based on the four corners of the affidavit.

## 2.  *Validity of the January 16, 2013 Warrant for Defendant's Residence*

### a.  *Potential Criminal Activity Described in the Affidavit*

Defendant specifically argues that the allegations in the affidavit "boil down to 3 key points."  D.E. 70 at 33.  "1. A 16 year old leaves home during the night and her whereabouts are unknown…2. In the recent past the missing juvenile had possibly spoken to [Defendant] at least 2 times by cell phone, and 3. (During an approximately 24 hour investigation) [Defendant] was not seen at his residence…and could not be reached by phone."  *Id.* (emphasis removed). According to Defendant, based on these facts, the warrant "incredulously" was issued to search Defendant's residence and "seize his computer equipment and related items."  *Id.*  The United States argues that, based on the affidavit, the issuing judge had "a substantial basis for finding probable cause that evidence of Defendant engaging in unlawful transactions with a minor and custodial interference would be found in his residence, including in computers, cell phones, and digital media storage devices."  D.E. 66 at 11.  The United States concedes that there was no basis in the affidavit to support a probable cause finding as to drug trafficking and child pornography.  *Id.* at 13.  Therefore, the Court's analysis focuses upon probable cause concerning custodial interference and unlawful transaction with a minor.

Pursuant to KRS § 509.070, a "person is guilty of custodial interference when, knowing that he has no legal right to do so, he takes, entices or keeps from lawful custody any mentally disabled or other person entrusted by authority of law to the custody of another person or to an institution."  Further, KRS § 530.070 provides, in relevant part, a person is guilty of unlawful transaction with a minor in the third-degree, when he "knowingly induces, assists, or causes a

17

minor to engage in any other criminal activity" or "he persistently and knowingly induces, assists or causes a minor to disobey his parent or guardian."  Because these are the only two offenses the United States contends were supported by probable cause in the affidavit, the Court determines whether the issuing judge had a substantial basis to conclude that the affidavit provided probable cause to support the search of Defendant's residence for evidence or fruits of custodial interference and/or unlawful transactions with minors in the third-degree.

   *b. Assessment of Criminal Activity*

   The affidavit, which the Court has reviewed in its entirety, summarizes Hudson's involvement in the case up until around 8:00 a.m. on January 16, 2013.  Government's Exhibit 1 at 2.  It states that Hudson was advised that "the juvenile left the residence in the middle of the night after she became upset with her parents for grounding her after discovering she had been talking to a 44 year old man on a cell phone."  *Id*.  The affidavit states that the mother of the juvenile spoke with Defendant on the phone and "he denied having the juvenile with him and refused to give his location."  *Id*.  The affidavit states that, based on an investigation at Knox Central High School, Hudson learned that "the juvenile had told [her friends] about and even asked the friends if they would think any less of her if she dated [the forty year old]."  *Id*.  The affidavit relays that Hudson obtained Defendant's cell phone number from one of the juvenile's friends, and learned that Defendant and the juvenile "had carried on a lengthy conversation" on the friend's phone.  *Id*.  The affidavit states that Hudson attempted to contact Defendant on his phone and was unsuccessful, subsequently learning that the phone "was shut off and un locatable [sic]."  *Id*.

   It further indicates that Hudson visited Defendant's residence, Defendant was not home, and that the "residence was checked throughout the evening and through the night by officers

18

with no one home at the residence." *Id*.  The affidavit states that, as of 7:30 a.m, the juvenile's parents had not heard from the juvenile, and that Defendant's "where about's [sic] is unknown as well according to the parents own independent investigation." *Id*.  Finally, the affidavit concludes with "Affiant has reasonable and probable cause to believe that grounds exist for the issuance of a Search Warrant, based on the aforementioned facts, information and circumstances and prays that a Search Warrant be issued, that the property be seized, or any part thereof, and brought before any court and/or retained subject to order of said court." *Id*.

Reviewing the affidavit in the required commonsense manner, the elements of custodial interference and unlawful transaction with a minor in the third-degree, and giving "great deference" to the issuing judge's decision, it cannot be said that the issuing judge had a substantial basis for finding that the affidavit established probable cause to believe the residence would contain fruits, instrumentalities, or evidence of a crime for several reasons.  The main flaw is that nothing in the affidavit ties Defendant or any criminal activity to the residence.  But all the defects are described below because they are relevant to a *Leon* analysis.

First, the affidavit for the January 16 warrant does not establish probable cause that Defendant had committed the crime of unlawful transaction with a minor.   Under KRS § 530.070, in order for an individual to be found guilty, it must be proven that he persistently and knowingly induced, assisted, or caused a minor to disobey his parent or guardian.   Nothing in the affidavit alleges that Defendant had any knowledge of any specific direction from the juvenile's parents that he could have induced, assisted, or caused her to disobey.

The affidavit states that the mother spoke to Defendant on his cell phone, but does not describe anything that she said.  Further, the affidavit does not provide any other source of information from which Defendant could have learned of a specific direction from the juvenile's

19

parents.  There is no indication that the juvenile had relayed such information to Defendant. Moreover, at no other point in the affidavit does it provide information about any specific direction the juvenile received from her parents.  Of course, a court is entitled to make reasonable inferences when evaluating an affidavit, however, the inferences demanded to be made here in the context of unlawful transactions are too much of a leap from the facts presented.  Based upon this affidavit, the issuing judge did not have a substantial basis upon which to conclude that the crime of unlawful transaction with a minor in the third-degree had occurred.

However, given the deferential standard afforded to the issuing judge's decision, there was a substantial basis for the issuing judge to conclude that custodial interference in violation KRS § 509.070 may have occurred.  In order to establish that custodial interference has occurred, it must be proven that "knowing that he has no legal right to do so, [an individual] takes, entices or keeps from lawful custody any mentally disabled or other person entrusted by authority of law to the custody of another person or to an institution."  K.R.S. § 509.070.  The affidavit establishes a substantial basis to conclude that probable cause existed to believe that the juvenile was with Defendant after having run away from home.  Through his investigation, Hudson consistently received evidence that made it reasonable to conclude that the juvenile was with Defendant.  The affidavit presents evidence that Defendant and the juvenile were in a relationship, that they talked at length, and that Defendant was attempting to conceal his location by turning off his cell phone and not returning to his residence.  Therefore, there is probable cause to believe that he was enticing the juvenile to stay away from her parents, or keeping her from them.

Moreover, the affidavit provides probable cause to believe that he did so knowingly. The affidavit states that, presumably on the morning of January 15, 2013, the juvenile's mother spoke to Defendant via cell phone. It further alleges that Defendant "denied having the juvenile with him and refused to give his location." Given this information, and the information that Defendant turned his cell phone off and did not return to his residence, one can reasonably infer that Defendant knew he was keeping the juvenile from the lawful custody of her parents. Thus, the affidavit establishes that there was probable cause to support a finding that Defendant was committing the crime of custodial interference. But this is only one step in the analysis.

### c. Nexus Between the Criminal Activity and the Items Searched for and Seized

An affidavit must also establish a nexus between the criminal activity and the items to be searched for and/or seized. *See Armstrong v. City of Melvindale*, 432 F.3d 695, 699-700 (6th Cir. 2006) (warrant was invalid where the affidavit did not establish that documents seized evidenced a crime). In this regard, the January 16, 2013 warrant is lacking with respect to the computers and digital media storage devices, but establishes probable cause for the search for and/or seizure of cell phones.

First, there is absolutely no nexus whatsoever between the majority of the items to be searched for and seized under the warrant and the crime of custodial interference. The affidavit requests that the warrant be issued to search for items that are completely unrelated to custodial interference such as evidence related to drug trafficking, stolen items, and firearms. The United States concedes that references to drug trafficking and child pornography were unsupported by the affidavit, but argues that this is not fatal to the warrant. D.E. 66 at 13.

The United States urges the Court to only consider those portions that are supported by the affidavit. The United States is correct in its assertion that "infirmity due to overbreadth does

not doom the entire warrant; rather, it 'requires the suppression of evidence seized pursuant to that part of the warrant…but does not require the suppression of anything described in the valid portions of the warrant[.]'" *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001) (quoting *United States v. Brown*, 984 F.2d 1074, 1077 (10th Cir. 1993)).  Although the child pornography portion of the warrant and affidavit should not be considered, the United States urges the Court to find that evidence of Defendant engaging in custodial interference would be found in "computers, cell phones, and digital media storage devices."[2]  D.E. 66 at 11.

Therefore, the question is whether the affidavit establishes a sufficient nexus between custodial interference and "computers, cell phones, and digital media storage devices."  Here, the affidavit sufficiently establishes the required nexus between the crime and the Defendant's cell phone.  The affidavit contains evidence that Defendant had been using a cell phone to talk to the juvenile and to the juvenile's mother.  Government's Exhibit 1 at 2.  This included a "lengthy conversation" between the juvenile and Defendant utilizing "a cell number…belonging to Jerry Luke."  *Id.*  The issuing judge had a substantial basis to believe that "cell phones" could be a fruit, instrumentality, or evidence of custodial interference in violation of KRS § 509.070.  Thus, the affidavit provides a sufficient nexus between the crime and Defendant's cell phone(s).

The affidavit does not, however, include facts to create a sufficient nexus between custodial interference and "zip drives, external hard drives, [or] computers[.]"  The affidavit contains no information regarding any transmission of a communication between the juvenile and Defendant on any computer or computer-based service.  In fact, the affidavit makes no reference to any text-based communication between the two, as it indicates that the juvenile and Defendant had been "talking" on a cell phone, that the mother and Defendant had "spoken" on

---

[2] Notably, the United States does not argue that the portion of the warrant allowing for the seizure of pictures and C.D.'s was supported by probable cause.  Accordingly, the Court limits its analysis to computers, cell phones, and digital media storage devices.

the phone, and that Defendant and the juvenile had "carried on a lengthy conversation" on the cell phone.  None of these communications are the type that would be stored in any sort of computer-based storage medium.  There is no basis in the affidavit to conclude that there is any connection between the alleged criminal conduct and any zip drives, external hard drives, [or] computers[.]"          Accordingly, the affidavit did not contain probable cause for the search for, or subsequent seizure of, the computers, zip drives, external hard drives, cameras, the hand-held radio, or camcorder that were seized.

### d. Nexus Between the Criminal Activity and the Residence

When a residence is to be searched, the warrant or attached affidavit must establish "why evidence of illegal activity will be found 'in a particular place.'"  *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004).  "There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'"  *Id*. (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)).  "The critical element in a reasonable search is not that the owner of property is suspected of a crime but that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought."  *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (quoting *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005)).

To determine whether probable cause exists to search a particular place, an issuing judge should ask "whether 'given all the circumstances set forth in the affidavit…there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  *Mills v. City of Barbourville*, 389 F.3d 568, 575-76 (6th Cir. 2004) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  However, "the nexus 'need not, and often will not, rest on direct observation, but rather can be inferred from the type of crime, the nature of the items sought, the extent of an

opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]." *State v. Gurney*, 36 A.3d 893, 900 (Me. 2012) (quoting *State v. Samson*, 916 A.2d 977, 982 (Me. 2007)).

Even though the affidavit provided probable cause for the search and seizure of Defendant's cell phones, it wholly fails to establish a nexus between his phones and the residence. First, and most importantly, the affidavit is devoid of any information as to how law enforcement knew that the residence was Defendant's. An affidavit must establish the basis for law enforcement's knowledge that the place to be searched is tied to the criminal suspect. *See, e.g.*, *Mills*, 389 F.3d 568; *United States v. Roach*, 582 F.3d 1192 (10th Cir. 2009) (invalidating warrant in which law enforcement failed to describe how they determined the place to be searched was Defendant's residence); *United States v. Brown*, 832 F.2d 991 (7th Cir. 1987) (affidavit failed to establish how law enforcement knew the residence searched was one of Defendant's addresses).

The affidavit indicates that the address for the residence is "occupied by [Defendant]." Government's Exhibit 1 at 2. However, it does not describe, in any way, how law enforcement knew that to be the case. It states that Hudson "was unsuccessful…[in making contact at Defendant's] residence" and that "[Defendant's] residence was checked throughout the evening and through the night by officers with no one home at the residence." *Id*. These are the only statements contained in the affidavit referencing the residence and law enforcement's knowledge of it. No basis of that knowledge is provided. Simply put, there is no basis to establish that the residence described in the affidavit actually was Defendant's. Without this, there cannot be a sufficient nexus between the evidence sought and the place to be searched, and the warrant fails on this basis alone.

Second, even if the residence to be searched was sufficiently tied to Defendant, the warrant provides no basis to reasonably infer that Defendant's phone, or any of the listed items, would be located at his residence.  The affidavit is devoid of any facts that tie any criminal activity to Defendant's residence.   No statements from any witness tie the juvenile to the residence, and, per the affidavit, no aspect of the suspected crime occurred there.  In truth, the affidavit discounts the possibility that Defendant and/or the juvenile were at the residence on either January 15 or 16, 2013.  The affidavit states that Hudson personally "attempted to make contact" at Defendant's residence, but was unsuccessful.   Government's Exhibit 1 at 2. Moreover, it states that "[Defendant's] residence was checked throughout the evening and through the night by officers with no one home at the residence."  *Id.*  Thus, the affidavit not only fails to tie either the juvenile or Defendant to the residence during the commission of the crime, it provides information that dispels any implication that the residence was involved in the crime.   Defendant was never observed there during the relevant period, despite significant surveillance by law enforcement.

Moreover, nothing in the affidavit suggests that law enforcement had any reason to believe that any of the property to be searched for and seized would be found in the residence. There is no evidence that anyone knew Defendant to keep his cell phones in the residence. Nothing exists to suggest that Defendant had been talking to the juvenile while at this residence, or that law enforcement, based on training or experience, believed an individual would leave their cell phones in their residence whenever they are not home.  There is simply nothing to tie the residence to any fruit, instrumentality, or evidence of the criminal activity.  The affidavit does nothing but establish that Defendant is suspected of a crime, and this is not sufficient to

create the required nexus with the residence. *See United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010).

The United States argues that the nexus between the crime, the object, and the residence is established by the inference that "Defendant's residence would be a natural place for the juvenile and Defendant to have visited the night that the juvenile left home, before anyone knew she was missing." D.E. 66 at 13. Because of this, the United States asserts that "[t]he residence could therefore have had evidence of any further unlawful transactions with a minor that may have occurred there, as well as clues to where the juvenile and Defendant might have gone." *Id.* However, based on the analysis above, this inference is not supported by any information within the four corners of the affidavit. The affidavit is completely devoid of any reasonably reliable information establishing Defendant as the owner of the residence, or any connection between the residence and criminal activity.

Thus, giving all required deference to the issuing judge's decision, the affidavit provided a substantial basis to find probable cause to believe that the crime of custodial interference had occurred. Given the elements of that offense, the affidavit provided a sufficient nexus between the suspected criminal conduct and the seizure of cell phones, but did not establish a sufficient nexus for the search and seizure of anything else in the warrant including pictures, zip drives, external hard drives, computers and C.D.'s. However, the four corners of the affidavit contained no information to establish the required nexus between the criminal activity or Defendant's cell phone and the place to be searched, or any basis of knowledge to tie Defendant to the residence to be searched. Therefore, the search and seizure of the items pursuant to the January 16, 2013 warrant violated the Fourth Amendment.

### 3. Good Faith

Typically the exclusionary rule would operate to exclude all evidence seized as a result of a defective warrant.  However, the United states argues that the good faith exception should apply.  In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court held that "the exclusionary rule should not bar the government's introduction of evidence obtained by police officers acting in objectively reasonable reliance on a search warrant that is subsequently invalidated."  *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (citing *Leon*, 468 U.S. at 918-21).

> It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.  In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.  Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.  Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.

*Leon*, 468 U.S. at 921 (internal markings and quotation omitted).

There are four instances in which *Leon* does not apply: "(1) the magistrate was 'misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth' (2) the magistrate 'abandoned his judicial role' or neutrality; (3) the warrant was 'so lacking in indicia or probable cause' as to render official belief in its existence unreasonable; or (4) the warrant was so 'facially deficient' that it could not reasonably be presumed valid."  *United States v. McClain*, 444 F.3d 556, 564 (6th Cir. 2005) (quoting *Leon*, U.S. at 923).  "The conclusion that the officers' reliance on the warrant was objectively reasonable requires a 'less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause."  *United States v. Soto*, 794 F.3d 635, 646 (quoting *United States v. Higgins*, 557 F.3d 381, 391 (6th Cir. 2009)).

Defendant argues that the *Leon* good faith exception should not apply for two reasons. First, he argues that the affidavit contained "many false and inaccurate provisions."  D.E. 70 at 41.  Defendant asserts that the falsehoods are material to the affidavit, and that Hudson admitted to "a long and deliberate pattern of obtaining overly broad search warrants."  *Id*.  According to Defendant, without suppression of this evidence, there will be no deterrent for law enforcement's conduct.  *Id*.  Second, Defendant alleges that the good faith exception should not apply because the affidavit is "so lacking in probable cause as to make reliance on the warrants unreasonable." *Id*.  Each argument will be considered in turn.

Defendant is correct that Hudson testified the affidavit contained broad "template" language that was not supported by the factual allegations.  However, there is nothing in the record suggesting that the issuing judge was misled by these statements in finding that there was probable cause to issue the warrant.  The "falsities," discussed extensively above, included a request to search for stolen items and drug-related materials.  It cannot reasonably be said that this information, while admittedly false, would have had any affect upon the issuing judge's decision.  The concerns contemplated by *Leon* are not implicated by Hudson failing to delete irrelevant information from the affidavit, and there is no evidence that this was done in an attempt to manufacture probable cause.  Thus, this exception does not apply.

Defendant's next argument as to why *Leon* should not apply is that the warrant was "so lacking in probable cause as to make reliance on the warrants unreasonable." D.E. 70 at 41.  An affidavit is "so lacking in indicia of probable cause" when it "contains only 'suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge. . . .'"  *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996)).  Such affidavits

28

"have come to be known as 'bare bones' affidavits." *Id.* The "so lacking" test is even less demanding than the substantial basis determination that applies to probable cause because otherwise the exception would be devoid of substance. *Id.* Courts are again bound by the four corners of the affidavit in making this determination. *United States v. Rose*, 714 F.3d 362, 367 (6th Cir. 2013) (citing *Laughton*, 409 F.3d at 750-52).

Here, the Court cannot find that law enforcement was acting reasonably in executing this warrant because the affidavit had no information whatsoever establishing in any nexus between (1) the place to be searched and (2) Defendant or the suspected criminal activity. *Leon* is "applicable in cases where…the affidavit contained a minimally sufficient nexus between the illegal activity and the place to be searched to support an officer's good-faith belief in the warrant's validity, even if the information provided was not enough to establish probable cause." *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004); *see also United States v. Van Shutters*, 163 F.3d 331 (6th Cir. 1998); *United States v. Schultz*, 14 F.3d 1093 (6th Cir. 1994); *United States v. Savoca*, 761 F.2d 292 (6th Cir. 1985).

The Court in *Carpenter* found that, despite an affidavit that failed to establish the required nexus, it "was not totally lacking in facts connecting the residence to [the criminal activity]" and thus, the minimal nexus was established. *Carpenter*, 360 F.3d at 596. In *Carpenter*, law enforcement had observed a marijuana patch via aerial surveillance and sought a warrant for the suspects' residence. The affidavit detailed the residence with particularity, but it failed to establish that the residence belonged to the suspects. *Id.* at 593. However, the minimally sufficient nexus was established because the affidavit showed that the marijuana was growing near the residence, and there was a pathway between the marijuana patch and the residence. *Id.* at 596.

29

Here, in contrast to *Carpenter*, the affidavit is wholly devoid of any information linking Defendant, or any criminal activity, to the residence.  This posture is more analogous to cases from outside this circuit.  In *United States v. Hove*, 848 F.2d 137 (9th Cir. 1988), a case recognized by the Sixth Circuit in *Carpenter* as providing useful context, the Ninth Circuit found that, because law enforcement obtained a warrant based upon an affidavit that failed to provide any nexus between the residence and the illegal activity, *Leon* did not apply.  *Hove*, 848 F.2d at 139-40 ("[T]he affidavit does not link this location to the defendant and it does not offer an explanation of why the police believed they may find incriminating evidence there; the affidavit simply lists the [location] address as a location to be searched.").  Because the nexus was not established by any evidence, the Ninth Circuit found that any law enforcement "belief in the existence of probable cause must be considered unreasonable" and thus *Leon* did not apply. Similarly, in *United States v. Gonzales*, 399 F.3d 1225 (10th Cir. 2005), the Tenth Circuit applied the "minimal nexus" formulation in *Carpenter* and found that *Leon* did not apply when the application "was not supported by any facts establishing the residence belonged to or was otherwise linked to" the suspect.  *Gonzales*, 399 F.3d at 1231.  "For good faith to exist, there must be some factual basis connecting the place to be searched to the defendant or suspected criminal activity.  When this connection is wholly absent, the affidavit and resulting warrant are 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"  *Id*. (citing *Leon*, 468 U.S. at 923).

As analyzed above, the affidavit completely failed to provide any information as to how law enforcement knew the residence was "occupied" by the Defendant.  Instead, there are mere conclusory assertions that the residence was Defendant's and that law enforcement had attempted to make contact with Defendant at the residence.  Government's Exhibit 1 at 2.

Moreover, the affidavit failed to provide any information as to why any evidence, fruit, or instrumentality of a crime would be found at the residence.  It contains no information or opinions that there would be anything connected to the suspected criminal activity in the residence.  It does not allege that Defendant or the juvenile had been in the residence, or that any crime had occurred there.  In fact, the affidavit establishes that the Defendant had not been at the residence recently, as law enforcement "checked [the residence] throughout the night."  *Id*.  This is not enough to create a "minimally sufficient nexus" for *Leon* to apply.

Therefore, the warrant was so lacking in indicia of probable cause in establishing a minimally sufficient nexus between the residence and the criminal activity, or the Defendant, as to make law enforcement's reliance on the warrant objectively unreasonable.  Accordingly, the January 16, 2013 warrant was invalid, and law enforcement's reliance on it was unreasonable.

**B.  *Validity of the January 16, 2013 Search of the Residence and Seizure under Consent and Plain View***

In the alternative, the United States argues that, in the absence of a valid warrant, the search of the residence and seizure of the items were appropriate pursuant to a valid consent to search and the plain view doctrine.  Defendant does not argue that his consent to the search of the residence was invalid, but he does argue that the seizure of the computer equipment is not supported by the plain view doctrine.  D.E. 70 at 34.  According to Defendant, there was nothing "immediately incriminating" about the items seized.  *Id*. at 35.  The United States argues that, while the items may have been innocuous on the surface, given the knowledge of the officers at the time, they were incriminating when viewed by the officers.  D.E. 66 at 18-19.

The United States bears "the burden of proving the legality of a warrantless search [or seizure.]"  *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007).  Warrantless seizures "presumptively violate the Fourth Amendment[.]"  *United States v. Mathis*, 738 F. 3d 719, 732

(6th Cir. 2013) (citing *Arizona v. Hicks*, 480 U.S. 321, 326-27 (1987)).   The United States Supreme Court has recognized, however, that "under certain circumstances the police may seize evidence in plain view without a warrant."  *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971).  The plain view doctrine applies when 1) the object is in plain view; 2) "the officers did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; 3) the item's "incriminating character" is "immediately apparent"; and 4) the officers have a "lawful right of access to the object itself."  *Horton v. California*, 496 U.S. 128, 136-137 (1990).

Here, law enforcement was lawfully inside the residence pursuant to Defendant's consent.   "One of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Davis v. United States*, 328 U.S. 582, 593-94 (1946)).  In order to justify a search based on consent, the government must prove that consent "was 'freely and voluntarily given,' and was not the result of coercion, duress, or submission to a claim of authority."  *United States v. Bueno*, 21 F.3d 120, 126 (6th Cir. 1994) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).   "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."  *United States v. Lee*, 793 F.3d 680, 684 (6th Cir. 2015) (quoting *Schneckloth*, 412 U.S. at 227).

The facts establish that Defendant's consent to law enforcement's search of his home was voluntary and not the product of coercion, duress, or submission to a claim of authority.  Upon arriving at the residence, Defendant was allowed to enter his residence, by himself, through a window.  After entering the residence, Defendant came directly to the door, unlocked it, and

voluntarily allowed the officers into his home.  Moreover, when asked if law enforcement could have a look around, Defendant said "absolutely."  There is no evidence, based upon these facts, that this verbal consent was anything but the product of Defendant's own free will.

Similarly, the written consent to search form that Defendant signed further evidences the voluntariness of Defendant's consent to the officer's search of his residence.  Both officers testified that Defendant read the form, never expressed any confusion or misunderstanding of the form, and then signed it.  It is true that the form states that law enforcement did not have a search warrant, when in fact they did have a warrant for the home.  However, this does not affect the voluntariness of Defendant's consent.  Law enforcement officers are generally prohibited from falsely claiming to have a warrant in order to obtain consent.  *See Bumper*, 391 U.S. 54.  But no authority brought to the Court's attention supports improper coercion in not revealing the existence of a warrant.  Thus, the Court finds that both Defendant's oral and written consent were sufficient to allow for the search of his residence.

Because Defendant's consent was valid, the officers did not violate the Fourth Amendment in arriving at the place from which the objects could be viewed.  Moreover, Defendant has conceded that the items seized were in plain view and that the officers had a lawful right of access to the items.  D.E. 70 at 35.  Thus, the only determination that must be made is whether the items' "incriminating character" was "immediately apparent."  *See Horton*, 496 U.S. at 137.  Defendant argues that the computer equipment that was seized was not immediately incriminating to the officers and therefore could not have been seized pursuant to the plain view doctrine.  Defendant asserts that "there is no suggestion the seized items were involved with the missing juvenile in anyway [sic]."  D.E. 70 at 37.  Moreover, Defendant argues that the items "required further investigation to determine their unlawfully quality" and thus,

they were not "inherently incriminating."  *Id.*  The United States argues that, based on the facts known to the officers at the time of the search, the incriminating character of the computer equipment was apparent.  D.E. 66 at 18.

In order to assess the "immediately apparent" prong, Courts consider four instructive factors: "(1) the nexus between the seized item and the items particularized in the warrant, (2) whether the intrinsic nature or appearance of the item gives probable cause to believe it is associated with criminal activity, (3) whether the officers, at the time of discovery of the item and with the facts then available, can determine probable cause of the item's incriminating nature, and (4) whether the officer can recognize the incriminating nature of the item as the result of his instantaneous sensory perception."  *United States v. Mathis*, 738 F.3d 719, 732 (6th Cir. 2013) (citing *United States v. Garcia*, 496 F.3d 495, 510-11 (6th Cir. 2007)).  Probable cause does not require knowledge that the seized property is contraband, but "when an item appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity, the item is not immediately incriminating."  *United States v. McLevain*, 310 F.3d 434, 441-443 (6th Cir. 2002) (quoting *United States v. Byrd*, 211 F.3d 1270, 2000 WL 491511, **3 (6th Cir. 2000) (unpublished opinion)).

Here, applying these factors to the computer equipment seized from Defendant's residence, the Court finds that the items' incriminating character was not "immediately apparent."  First, as discussed above, the officers were not in possession of a valid search warrant for such computer equipment.  The warrant was lacking in probable cause and was thus invalid.  Therefore, there was no appropriate nexus between the items seized and the items particularized in the warrant.

Likewise, the second factor counsels against a finding that the items were "immediately apparent." None of the items seized had any intrinsic nature or appearance that would give rise to probable cause to believe they were associated with criminal activity. The items were standard technological devices, with no incriminating marks or writing on the outside. They did not appear to be involved in any crime. Moreover, Hudson admitted that none of the computer equipment seized was "immediately incriminating." D.E. 62 at 138. There is simply nothing about the intrinsic nature of these devices that would support a finding of probable cause that the items were associated with criminal activity.

Third, the record does not support that law enforcement, at the time of discovery of the items and with the facts then available, could have determined probable cause of the items' incriminating nature. At the time of the seizure, officers had arrested Defendant for third-degree unlawful transaction with a minor and custodial interference. Inside the residence they had observed some handcuffs, a whip, and a small cage that did not appear to house an animal. Moreover, in Defendant's truck and residence, they had found a total of eighteen pornographic magazines, all of which Hudson confirmed were legal. The juvenile had informed them that she and Defendant had engaged in sexual relations at his residence, and that Defendant and the juvenile had viewed pornography together. Law enforcement was also aware that Defendant and the juvenile communicated electronically, and that the juvenile had contacted her family via an electronic device. The juvenile's parents had not relayed any information that would tie the computer equipment to any crime.

More circumstantially, Hudson testified that "the juvenile [Defendant was with]—she didn't even look 16. She looked more to be nine years old. She's extremely small, petite." D.E. 62 at 85. Hudson also testified that, when coupling this with the pornographic magazines which

35

"themselves portrayed [what] looked [like] ten-year-old kids," he made the inference that Defendant was "attracted to younger…girls." *Id*. at 86.   Moreover, Hudson testified that he thought the amount of computer equipment found in the residence was unusual. *Id*. at 159-60.   It was on this basis that Hudson testified he believed the computer equipment would contain child pornography. *See id.* at 85 (Hudson testifying regarding his basis for the second warrant).

The United States argues that this evidence is enough for a finding that, at the time of the seizure, law enforcement had probable cause to believe the computer equipment could be, or contain, evidence of unlawful transactions with a minor and child pornography.   D.E. 66 at 18-19.   This argument is not persuasive.   As noted, the officers do not have to have actual knowledge that the evidence is contraband, rather "probable cause is a flexible, common-sense standard.   It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime." *McLevain*, 310 F.3d at 441 (quoting *Texas v. Brown*, 460 U.S. 730, 742)).   Despite this flexibility, law enforcement had no basis to conclude there was probable cause that these items were incriminating.

Officer Hudson's assessment that the magazines depicted younger girls is not persuasive in light of his own testimony that the magazines were legal pornography.   He knew the images on the magazine covers were of adults (D.E. 62 at 158), and he merely saw one of the eighteen magazines that depicted an of-age girl appearing to be younger than eighteen.   Similarly, every item viewed inside Defendant's residence was legal to possess.   The small cage with the mask, the handcuffs, and whips, although perhaps strange, do not indicate criminality.   The "unusual amount" of computer devices that were found inside Defendant's residence does not give rise to a reasonable belief that illegal activity was occurring.   In fact, the numerosity of the items seized

does not seem "unusual" to the Court in any significant way.  *See* Government's Exhibit 1. Many homes in the United States would contain the same amount of, if not more, computer towers, zip drives, hard drives, cellphones, and cameras.

Furthermore, law enforcement had no evidence that connected Defendant to creating, distributing, or possessing child pornography.  It is true that law enforcement was aware that Defendant and the juvenile had sexual intercourse at this residence.  However, they had no information to believe that any part of this act was recorded or documented anywhere on the items that were seized.  A digital camera was found, but there is nothing about its location, apparent use, or tie to any other property found that indicates, in any way, that it was connected to any aspect of child pornography or the sexual relationship between Defendant and the juvenile.  It should also be noted that Hudson's statements that Defendant had an affinity for young girls does not, without more, indicate criminality.  This is not enough to support probable cause that these items were incriminating.  Hudson merely had a hunch, which fails to establish probable cause.

The United States is asking the Court to make a logical leap based upon legal evidence and law enforcement's hunches about Defendant.  The Court cannot do that, thus the third factor does not favor finding that the incriminating nature of the items was "immediately apparent." Finally, as noted, the fourth factor requires that an officer "can recognize the incriminating nature of the item as the result of his instantaneous sensory perception."  *United States v. Mathis*, 738 F.3d 719, 732 (6th Cir. 2013) (citing *United States v. Garcia*, 496 F.3d 495, 510-11 (6th Cir. 2007)).  Further, as the Sixth Circuit has said, even if an item appears suspicious, but a further investigation is necessary to establish probable cause to its relation with criminal activity, the item cannot be said to be immediately incriminating.  *See United States v. McLevain*, 310 F.3d

37

434, 441-443 (6th Cir. 2002) (quoting *United States v. Byrd*, 211 F.3d 1270, 2000 WL 491511, **3 (6th Cir. 2000) (unpublished opinion)).  Given this analysis, the Court cannot conclude that the seized item's "incriminating character" was "immediately apparent."  Accordingly, despite that the search of the residence was valid pursuant to Defendant's valid oral and written consent, the seizure of the computer items was not valid under the plain view doctrine.

Finally, the Court notes that Defendant's consent did not, standing alone, authorize the seizure of the items from his home.  When evaluating the permissible scope of a consent to search, the relevant inquiry is based on "'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  Certainly, an individual can consent to the search of a residence that encompasses any computer found therein.  *See United States v. Lucas*, 640 F.3d 168 (6th Cir. 2011) (finding a valid consent included the search of a laptop where device did not have a password, there was substantial evidence tying the device to criminal activity, and Defendant was present when officers began using the device.).

In this case, the United States does not argue that the scope of Defendant's consent would include the seizure of the devices, and nothing in the record suggests it did.  A reasonable person would not have understood the exchange between Hudson and Defendant to have authorized the removal of the items from the home.  Hudson never mentioned what type of evidence that he was looking for, or mentioned computers in anyway.  Hudson merely asked, "[d]o you care if we look around?"  D.E. 62 at 71.  Moreover, the written consent did not include any specific crime being searched for, or mention computers.  As Hudson testified, the written consent was just confirming the oral consent that was previously given. A reasonable person would not have

understood the oral exchanges, which authorized a "look around" the house, to include the seizure of all of their computer equipment.

Accordingly, the United States has failed to meet its burden to establish the legality of the warrantless seizure. Therefore, while Defendant's consent to search was valid, the seizure of the electronic items was contrary to the Fourth Amendment.

### C. The January 17, 2013 Search Warrant

Defendant also attacks the validity of the January 17, 2013 warrant issued to search the seized items from Defendant's residence. The January 17, 2013 search warrant authorizes the search of "1) Acer computer tower, monitor, keyboard, mouse, web cam 2). Compaq computer tower 3). 15 zip drives & two camera memory cards 4). Two internal hard drives 5). Two external hard drives 6). Five cellphones", which are all items that were "seized in the search of 6410, KY 1232, Gray, KY."  Government's Exhibit 14.  The warrant authorized the search of these items for memory "containing but not limited to child pornography."  *Id*.

### 1. Probable Cause

As noted previously, when determining whether an affidavit establishes probable cause, the Court "must look only to the four corners of the affidavit" and must pay great deference to the issuing judge's determination.  *See United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010); *United States v. May*, 399 F.3d 817 822 (6th Cir. 2005).  Moreover, as long as the issuing judge had a substantial basis for concluding there was probable cause, the warrant is valid. *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991).

Here, the affidavit did not provide a substantial basis for the issuing judge to conclude that there was probable cause.  The affidavit, signed by Hudson, states that "there is reasonable and probable grounds to believe there is illegal pornography pictures of under age children but

not limited to other illegal conversations or activity within the memory of the seized items[.]" *Id.* The affidavit recounts the same information that was contained in the January 16 affidavit. In addition to this information, the January 17 affidavit describes information gathered subsequent to obtaining the January 16 warrant. The affidavit provides that Hudson received GPS tracking information for Defendant's cell phone, and located Defendant and the juvenile in Defendant's truck in a parking lot. Government's Exhibit 14 at 2-3. It includes that law enforcement located two pornographic magazines inside Defendant's truck, and that they learned that the juvenile had a sexual relationship with Defendant during their time together.

Additionally, the affidavit includes the observations law enforcement made inside Defendant's residence while conducting the first search.[3] The affidavit states that, inside the residence, law enforcement observed "a multitude of additional pornographic magazines, digital camera, along with whips, leg shackles and bondage restrains that indicate sexual domination along with the magazines preferring women of a young age." *Id*. at 3. Moreover, the affidavit indicates that law enforcement observed "a large amount of zip drives and external hard drives and two internal hard drives that had been removed from the towers." *Id*. Finally, the affidavit states that "[w]ith the nature of the investigation and items seen within the residence officers seized the computer used by the accused with his name Jerry Luke on the screen saver, a tower beside his operating computer (not in use). All hard drives, zip drives, external hard drives and memory cards within the residence along with a 35mm disposable camera and 35mm roll of film, a V.H.S. video record with film inside." *Id*. The warrant issued, and authorized the search of "[a]ny memory within the computer towers, internal hard drives, zip drives and memory cards, cell phones containing but not limited to child pornography." Government's Exhibit 15.

---

[3] The Court notes that, regardless of the illegality of the January 16 warrant, the observations included in the January 17 affidavit were made during the consent search authorized by Defendant. Accordingly, these observations were lawfully made.

Based on this affidavit, the issuing judge did not have a substantial basis to find that there was probable cause because there is no reason to conclude, based on the information in the affidavit, that there was any criminal activity relating to child pornography.  None of the information or items listed in the affidavit are illegal to possess.  The affidavit expresses the opinion that some of the items "indicate sexual domination," but provides no reason to believe, or evidence to establish, that such sexual activity included, in any way, child pornography.

Further, the affidavit alleges that there were multitudes of pornographic magazines found "preferring women of a young age," but it does not assert that the magazines themselves were child pornography.  On its face, this is a description of legal pornography involving "women," not illegal pornography involving "children."  The possession of legal pornography, even in the context of a sexual relationship between an adult male and a minor female, does not give rise to a reasonable belief that child pornography is somehow involved.  Again, Hudson's affidavit presented a mere hunch to the issuing judge.

Moreover, the observations by the officers of a "large amount" of zip drives and hard drives do not lend themselves to even a suspicion of any criminal activity whatsoever.  The number of items seized (*see* Government's Exhibit 13) is not so large as to indicate criminality of any sort.  The affidavit contains no opinion, based on the officer's training and experience, that this amount of devices indicates child pornography or any other criminal activity.  The affidavit states "[w]ith the nature of the investigation and items seen within the residence" but does nothing to detail this statement or explain how it establishes any sort criminal activity.

The information regarding the cameras observed and seized from the residence does not indicate that there was the production of child pornography occurring in the residence.  This is true despite the sexual nature of the other items found in the residence, and the fact that

Defendant had at least one sexual encounter with a minor. The affidavit does not provide any information as to where any of the cameras were located in the home. Certainly, if the cameras had been located in a manner that indicated they had been used to record sexual acts, with the sexual items in that area, an inference could be drawn that the production of child pornography had occurred.

The affidavit provides no information of that nature, and merely states that the items were observed within the residence. To find that it was reasonable for the issuing judge to make the inference that this created probable cause for child pornography is too far a leap. Under that logic, any person found to be having legal sexual relations with a minor, as was the case here, and found to be in the possession of a camera, say for instance as part of a smartphone, would be subject to search of all the computer devices in their residence. Probable cause requires more.

## III.  CONCLUSION

The Court intends for this Memorandum Opinion to be incorporated, in full, in its forthcoming recommended disposition on the motion to suppress. Following the entry of that recommended disposition, the parties will be given the opportunity to object pursuant to 18 U.S.C. § 636(b)(1)(B). Before the recommended disposition can issue, further input is needed from the parties.

The exclusionary rule generally requires the exclusion of evidence that is "directly" or "primarily" discovered as the result of an unlawful search. 6 Wayne R. LaFave, *Search and Seizure* § 11.4 (4th ed. 2004). Stated another way, the exclusionary rule prohibits the "introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988) (internal citation omitted). Under the fruit of the poisonous tree

doctrine, the exclusionary rule also "prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'"  *Id.* at 536-37 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

Despite the apparent breadth of the exclusionary rule, it is not without limitations. Indeed, suppression of evidence should not be a court's first impulse.  *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

> Real deterrent value is a necessary condition for exclusion, but it is not a sufficient one.  The analysis must also account for the substantial social costs generated by the rule.  Exclusion exacts a heavy toll on both the judicial system and society at large.  It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence.  And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment.  Our cases hold that society must swallow this bitter pill when necessary, but only as a last resort.  For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

*Davis v. United States*, 564 U.S. ----, 131 S. Ct. 2419, 2427 (2011) (quotations and citations omitted).  Therefore, "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence."  *Hudson*, 547 U.S. at 592.

Whether to exclude in this case is a complicated question.  The Court has found that the neither the first warrant, consent, nor plain view authorized the seizure of Defendant's computer equipment, and that, if only that seizure were at issue, *Leon* would not save it.  But, the Court has also found that Defendant's consent led to the perfectly permissible observations that law enforcement made during the search that were then relied upon to obtain the second warrant, which was also invalid.  But, was law enforcement's reliance upon those observations and other information when seeking the second warrant sufficient under *Leon* and following cases to save

the search?  Do the deterrence benefits of suppression outweigh its heavy costs as required by *Herring v. United States*, 129 S. Ct. 695 (2009) and *Davis v. United States*, 131 S. Ct. 2419 (2011)?

These are challenging questions, and the arguments presented to the Court thus far do not address all the relevant considerations.  The law is complicated as well and may, or may not be, settled.  In addition to the cases cited immediately above, the Court believes that a good ***starting*** point for counsel is *United States v. Fugate*, 499 F. App'x 514 (6th Cir. Sept. 7, 2012), which identifies certain relevant guiding Supreme Court and Sixth Circuit decisions.  Also potentially helpful are the characteristics identified by Judge Wier in footnote 16 of his Recommended Disposition in *United States v. Dawson*, No. 5:13-CR-7-DCR-REW, 2013 WL 1332573 (E.D. Ky. Mar. 15, 2013).  Of course, there is likely other helpful authority, and the Court certainly needs both parties to identify and discuss all relevant authority in the specific context presented by the Court's reasoning and findings above.

As such, the Court will allow for counsel to have sufficient time to review this Memorandum Opinion prior to conducting a conference call to schedule further briefing.  That conference call will be set by forthcoming separate order.

This the 31st day of May, 2016.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge